Pasquale ESPOSITO, Libelant,

v.

THE M/V FERNBAY, her engines, boilers, etc., Respondent.

No. 20461.

United States District Court
E. D. New York.

Dec. 29, 1958.

Alfred F. Muscio, New York City, for libelant.

Haight, Gardner, Poor & Havens, New York City, by William P. Kain, Jr., New York City, of counsel, for respondent.

BYERS, Chief Judge.

This cause involves a claim by libelant that he was injured on October 20, 1954, by reason of the unseaworthiness of The M/V Fernbay, and the negligence of her owner, in failing to provide him with a safe place to work.

Esposito was a winchman employed by Atlantic Stevedoring Co. on that day, and sometime between 8:30 and 9:00 A.M., while preparing to adjust his winch to operate the up and down boom at hatch No. 3, he fell, and suffered the injuries complained of.

He alleges that his fall was caused by the presence of wet paint that was slippery, on the top of the mast house on which he was compelled to stand while operating his winch.

There is proof that he did fall, and that he suffered pain in his lower back, and later was aware of certain restriction that he believes limited his subsequent activities as a longshoreman.

The question for decision is whether the proof justifies the allegations of his libel, comprehended in the above brief statement of his cause.

The pleading specifies the faults to have consisted in "permitting the deck and hatch (meaning the top of the mast house) to become greasy, oily and slippery, creating the dangerous situation as a result of which the libelant fell as aforesaid."

Findings:

1. The libelant Pasquale Esposito on October 20, 1954, being about 45 years

of age, was employed by Atlantic Stevedoring Company, as a winchman on The M/V Fernbay.

2. The vessel was owned by the claimant, D/S I/S Garrone.

3. The vessel lay at Pier 19 Staten Island in this District, bow in, starboard side to the pier.

4. The libelant reported for work at about 8:00 A.M. and proceeded to hold No. 3 and mounted to the top of the mast house located between hatches 2 and 3, and set about adjusting the rigging of the up and down boom, which was to be operated by the winch of which he was in charge.

5. Weather conditions did not contribute to the happening of which he complains.

6. At some time between 8:30 and 9:00 o'clock, and prior to actually starting the winch, and while in the act of moving toward it, he slipped and fell, sustaining some back injury.

7. The testimony does not establish that he was caused to fall because the top of the mast house was covered with paint that was slippery.

### Comment:

The testimony of the libelant, and his fact witness Mancino, variously described the substance as:

(Libelant) "I cannot say what it was. I know it was slippery. Contained probably some tar or fish oil or something like that."

(Mancino) " * * * there was oil, some kind of oil—fish oil or something like that, I don't know what kind of oil it was—and the deck was slippery."

Incidentally, the latter says that he slipped, but did not fall. Further, that after Esposito fell, some dunnage was obtained from the then opened No. 3 hatch, from the top of a stow of crude rubber in bales.

As to that, he named one Freedman, the gangway foreman, as the one who procured the dunnage. Freedman was not called as a witness, nor was it stated that he could not have been subpoenaed. The ex post facto use of dunnage was not convincingly shown.

The testimony of the Chief Officer Knutsen, for respondent, was persuasive that all steel decks (including the top of the mast house) had been covered with Bitulac, a black deck paint, about ten days prior to October 24, 1954, and that it dries in not more than one day's time.

He was mistaken by a few days, as is shown by the entry in the ship's log (which was produced and examined after the trial) under date of October 7th:

" * * * Painted with Bitulac the deck of both mast houses, both sides of after deck and the port side corridor."

It is uncontradicted that this is a job which is done about twice a year.

The Bitulac was not wet or slippery on October 20, 1954, and its application to the mast house deck on which libelant was working on that day, shown by the above log entry, was not the cause of his fall.

This seems to be conceded in libelant's brief, for an alternative theory is thus stated:

" * * * the libelant brings to the attention of this Honorable Court the entry of October 16th, which states, 'Greased discharging gear by hatches Nos. 1–3.' It is respectfully stated that at and near the mast house, where the winches are located, there always are extra cables on the deck, and they are always greasy, so that they will remain supple and flexible, to enable them to work smoothly.

"It is the contention of the libelant that an oily substance, and not Bitulac, was used by members of the crew; that the job was not done properly; that the deck had not been scraped and steel-brushed, but that the oil had been placed on the deck without first having removed the underlying grease, dirt, rust, etc.,

which is always present on the mast deck near the winches.

"One can readily see that grease is always present near the winches and discharging gear, as noted in the log for October 16th, on which day the discharging gear was greased.

"The Libelant respectfully requests this Honorable Court to take notice that when the discharging gear is greased, this also includes the runners on the boom, all cables of the winch, and all extra cables which usually rest on the deck, which cables are greased to keep them supple and flexible and running smoothly when the winch is in operation.

"It is a fact that if the deck is not scraped properly and the old residue of grease and dirt is not removed, this would create a slippery condition. If an oil paint is placed on the deck thereafter, the deck would not dry quickly, if at all, but would remain slippery, thereby making an already existing dangerous condition all the more hazardous."

This is an afterthought, and apart from the log entry itself, there is no testimony in the case to indicate how the greasing operation of the discharging gear was conducted, by whom, or whether there was any substance present on the mast house as the result of whatever was done to the discharging gear, four days before the libelant's fall.

It is realized that not too precise a requirement should be laid upon this libelant as to the nature of the substance that he says caused him to fall. It is equally true that when he attempts to hold a ship liable for unseaworthiness, or negligence, he should be prepared with convincing evidence to sustain his cause.

The argument that "if the deck is not scraped properly and the old residue of grease and dirt is not removed, this would create a slippery condition" is probably true, but the court cannot make a finding based upon a supposition that is not even suggested by the testimony.

The discharge in Boston was from hatches Nos. 5 and 2, according to Knutsen; this is consistent with the stowage plan as prepared by him. Thus there is nothing to indicate that the top of the mast house (supporting the winches needed to discharge from hatch No. 3) would have ben subjected to an accumulation of grease or oil attendant upon the operation in Boston, of the adjacent booms.

The testimony of Esposito and Mancino, while deemed to have been believed by them to be true, cannot be held to be sufficiently convincing to sustain the libelant's burden of proof, in the face of the reasonable probabilities concerning the true condition of affairs, as demonstrated by the opposing evidence.

Esposito's fall is as likely to have been caused by a stumble or by the missing of his footing, unrelated to unseaworthiness or negligence on the part of the ship, as by any other cause revealed in the evidence. Thus the libelant has not sustained his burden of proof. The accident from which he suffered was an incident of his calling, not the result of a failure of duty owed to him by the ship. It was to meet just such a happening that the Longshoremen's and Harbor Workers' Compensation Act, 33 U.S.C.A. § 901 et seq., was called into being.

This outcome of the litigation does not visit upon the libelant any financial hardship, such as is present in many cases, for the physical restrictions which are said to have prevented his doing heavy work, have not impaired his capacity to work as a winchman. His earnings in 1955 exceeded those in the previous year by over $1,500; in 1956 he earned $5,812.56 or over $800 more than in 1955, and in 1957, $6,370.55.

Conclusion of law:

The libel must be dismissed with costs, for failure of proof.

Settle decree.